## PPM Atlantic Renewable v. Fayette County Zoning Hearing Board

460

C.P. of Fayette County, no. 2009 of 2009, G.D.

*Daniel W. Rullo,* for appellant.
*Gretchen A. Mundorff,* for appellee Fayette County Zoning Hearing Board.
*Richard E. Bower,* for intervenor Neil Brown.
*Joseph E. Ferens,* for intervenor Fayette County.
*Gary Altman,* for intervenor Thomas J. Bozek.

LESKINEN, *J.,* June 17, 2010—This matter comes before the court on the appeal of PPM Atlantic Renew-

able from the decision of the Fayette County Zoning Hearing Board (ZHB or board). A previous appeal by PPM in this same matter was sustained and the matter was remanded to the ZHB by the Honorable Judge Ralph C. Warman. The current decision of the ZHB: (1) granted PPM's request for a height variance of 12.5 feet on 22 wind turbine towers; (2) denied all eight of PPM's request for setback variances; (3) denied PPM's special exception requests for the eight towers denied setback variances; and (4) granted the special exception requests for the remaining towers subject to seven detailed conditions.

On this appeal, PPM challenges the denial of the setback variances, challenges the denial of the special exceptions, and asserts that five of the seven conditions must be invalidated.

## BACKGROUND

PPM originally filed numerous petitions with the ZHB in September of 2007 requesting that it grant variances along with special exceptions in order to permit the construction of a wind power facility known as the South Chestnut Windpower Project in southern Fayette County, Pennsylvania. (The various petitions were consolidated for hearing.) The proposed project would be spread across an approximate three and one-half mile section of the Chestnut Ridge in Wharton, Georges, and Springhill Townships.

Wharton Township has its own zoning ordinances and the towers located in that township are not part of the subject matter of this appeal. In total, 22 of the 24 cur-

rently proposed turbines are located in Georges and Springhill Townships. Because neither Georges nor Springhill Townships have their own zoning ordinances, the Fayette County Zoning Ordinance applies to those towers.

Under the Fayette County Zoning Ordinance in existence in September of 2007, wind turbines are a "special exception" use in A-1 (agricultural-rural) zones. Article VIII, section 1000-876 of the ordinance imposes thirteen specific conditions on "windmill-wind turbines," including a minimum lot size, maximum height, setback, maximum noise, "viewshed impact analysis," "biological resource survey," "best management practices" to minimize erosion, siltation and water contamination, aircraft warning lights, location relative to airports, compliance with National Historical Preservation Act, location a minimum of one-half mile from any property listed on the national register of historic places, and a requirement to remove unused turbines and post a bond to secure such removal. In addition to the specific conditions noted, subsection N provides:

"The zoning hearing board may attach additional regulations pursuant to this section in order to protect the public's health, safety and welfare. These conditions may include but are not limited to increased setbacks."

The ZHB conducted hearings regarding PPM's applications on October 17, 2007, October 31, 2007, December 19, 2007, and January 30, 2008. Those hearings detailed the reasons why PPM chose the Chestnut Ridge locations, set forth the various advantages and disadvantages of wind power, and received public comments both

for and against the "wind farm." Subsequently, the ZHB issued Resolution 07-80, which denied PPM's requests in their entirety. PPM appealed seeking relief from the Fayette County Court of Common Pleas. That first appeal was assigned to Judge Warman, who ultimately filed a lengthy and learned opinion and order on April 30, 2009. Judge Warman remanded the application to the ZHB, directing it to act on the existing closed record, with a very specific instruction:

"The ZHB shall consider and grant each special exception as required by law and may impose whatever conditions they deem fit to protect the health, safety and general welfare of the community."

Subsequently, PPM filed a motion for clarification, which Judge Warman granted on May 15, 2009, primarily ruling that the ZHB was required to act based on the existing closed record. Judge Warman also ordered that:

"the Fayette County Zoning Hearing Board shall consider the requested variances, grant the special exceptions in accordance with the law, and impose any necessary conditions to protect the health, safety and welfare of the community." *(Order of May 15, 2009, p.2)*.

Subsequently, the ZHB issued Resolution 07-80R which:

(1) granted PPM's request for a height variance of 12.5 feet on all 22 towers;

(2) denied PPM's request for setback variances for eight towers numbered 11, 19, 21, 22, 23, 24, 25, and 26;

(3) denied PPM's special exception requests for the eight towers numbered 11, 19, 21, 22, 23, 24, 25, and 26 (because of the denial of the setback variances); and

(4) granted the special exception requests for the remaining towers numbered 1, 2, 3, 4a, 5, 6, 8, 9, 10, 11,[1] 15, 16, 17, 18, and 20 subject to seven conditions. Generally, the conditions required PPM to: (1) construct, prior to operational status, a 12-foot chain link fence around each turbine; (2) re-vegetate the disturbed forest land in a specified manner; (3) adopt specified measures to protect the bat population; (4) conduct specified sound studies; (5) increase setbacks on all turbines to 500 feet from roadways and 425 from *all* property lines, even the lines of participating landowner/lessors; (6) remove any turbines that remain unused for a period of twelve consecutive months within a six month period from nonuse; and (7) comply with §1000-876(A) – (N) of the Fayette County Zoning Ordinance and all the conditions set forth therein. Only the first five of those seven conditions are included in this appeal.

All of the present "re-appeal" issues stem from the parties' diametrically opposed interpretations of Judge Warman's decision on the first appeal. (It would appear to be in the interests of judicial economy to have assigned the within appeal to the judge who decided the first appeal, but this appeal received a new docket number when it was filed, and it was computer-assigned to the under-

---

1. By letter dated June 29, 2009, the solicitor for the board advised that the inclusion of tower 11 in the special exceptions granted in the resolution was a typographical error.

signed in accordance with established local court policy.)

PPM raises numerous grounds in the course of its appeal, including the specific assertion that "the board's determination was the product of partiality, prejudice, bias or ill will." Because the court finds other bases adequate to justify reversal and modification of resolution 07-80R, further discussion of that specific objection is unnecessary. However, in fairness, the court notes that the resolution clearly appears to be a well-intentioned and good faith effort by the ZHB to discharge its duties to the public. The brief filed by the solicitor of the ZHB is well written, thorough, and reflects appropriate advocacy and zeal. As noted in several authoritative sources cited herein, however, there are questions surrounding wind energy that no one, including the ZHB, can answer at this time. The court finds no basis whatsoever for the assertion of "partiality, prejudice, bias or ill will."

Most pertinently for purposes of the decision here, PPM also argues that the ZHB abused its discretion and committed errors of law by:

(1) denying the eight setback variances requested,

(2) denying the corresponding eight special exceptions, and

(3) imposing five unreasonable and unlawful conditions on the special exceptions that were granted.

This court is compelled to find that the law supports almost all of these contentions, and that it must grant most of the relief requested by PPM in accordance with this opinion and the appended order.

## DISCUSSION

While windmills have been around for centuries, wind turbines as a source of clean renewable "green" electric energy have recently become heavily emphasized as one of the best ways to reduce our collective dependence on more established technologies dependent on fossil fuels. The federal government has established a goal of 20 percent wind energy by 2030, and the Pennsylvania state government has established a goal of 18 percent renewable (wind, water, solar) power by 2020. Former State Senator Kukovich testified in front of the ZHB in this case regarding Pennsylvania's policy of supporting wind power. (Tr. 10/31/07, pp. 5-20.) The policy is embodied in law at Act 213 of 2004, which "basically says between now and the year 2020, 18 percent of the energy generated in the State needs to come, is mandated by law to come, from renewable alternative resources." (Tr. 10/31/07, p. 8.)

Unfortunately, just like a new prescription drug, new power technologies can have unpleasant and unforeseen "side-effects." And both the federal and state governments acknowledge candidly that there are many as yet unanswered questions as to the best practices for siting and operating wind-power "farms." *(20 percent Wind Energy by 2030: Increasing Wind Energy's Contribution to U.S. Electricity Supply* (2008) pp. 118-23.) (See also, *PA Wind Farms & Wildlife Collaborative-Home Page http://www.dcnr.state.paus/wind/index.aspx).* Even the state and federal governments with their massive budgets and ready access to experts cannot predict all the impacts of wind power technology at this time. Because of these

questions, local zoning governing bodies, and their appointed zoning hearing boards, lack the information that would allow them to make ideal decisions about location and operational conditions for wind power facilities.

Against that backdrop, however, there remains the matter of private property rights. Those rights are protected by the Fifth Amendment of the United States Constitution, and by Article 1, Section 1 of the Pennsylvania Constitution. In addition, there is the Constitutional prohibition against *ex post facto* laws—that the government cannot prohibit conduct "after the fact" when no law prohibited it at the time it commenced or occurred. To the extent the government interferes with the free use of private property, that interference must be strictly authorized by a pre-existing valid statute or ordinance. In zoning matters, the ZHB is limited to interpreting and applying the zoning ordinance in existence on the date the permit application was filed, and has no authority to rewrite or extend that ordinance. In plain language, where the statute or ordinance leaves any doubt, the landowner gets "the benefit of the doubt." If the law does not clearly prohibit a particular use, then the landowner has the right to devote his property to that use.

A court reviewing the decision of a zoning hearing board is bound by a narrow standard of review. It is well settled law in Pennsylvania that when a trial court takes no additional evidence the standard of review is limited to determining whether the board committed an abuse of discretion or an error of law. *Lombardozzi v. Millcreek Township Zoning Hearing Board,* 829 A.2d 779, 781 n.4 (Pa. Commw. 2003). An abuse of discretion can be es-

tablished if the ZHB's factual findings are not supported by substantial evidence. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 555, 462 A.2d 637, 639 (1983). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The errors asserted by PPM in this appeal are (1) the denial of setback variances for eight towers was an error of law or an abuse of discretion, (2) the denial of special exceptions for those eight towers was likewise an error of law or an abuse of discretion, and (3) five of the conditions placed on the special exceptions are invalid.

Because the denial of the setback variances is the basis for the denial of eight of the special exceptions, that issue has logical priority, and the court will address that issue first.

### 1) *Setback Variances for Towers Nos. 11, 19, 21, 22, 23, 24, 25, and 26*

As early as 1865, before the rise of zoning law, courts recognized municipal power to provide for wide streets and open spaces. See *In re Brunswick Ave.,* 48 Barb. O, 1865 WL 3828 (N.Y. Gen Term 1865). The Supreme Court of Pennsylvania acknowledged in 1928 that a primary purpose of setback restrictions in residential areas is to prevent the spread of fires between buildings. *See Appeal of Kerr,* 294 Pa. 246, 251, 144 A. 81, 83 (1928). The court went on to say, "[i]t is now, however, generally held that such regulations are valid under the police power, wherever they substantially tend to promote the health, morals, safety, or general welfare of the

public." *Id.* at 249, 144 A. at 83. Therefore, setbacks can be valid, and the decision of the ZHB to deny a setback variance would be valid, if the setback requirement substantially promotes the health, safety, or welfare of the public.

Under the Municipalities Planning Code (MPC), zoning hearing boards are empowered to hear requests for variances when a claim is made that the ordinance inflicts "unnecessary hardship." 53 Pa.C.S. §10910.2(a). In its conclusions of law regarding the requested variances, the ZHB board set forth the specific standard it applied to the variances requested here as set forth in section 1000-1102 of the Fayette County Zoning Ordinance:

"The applicant must provide evidence to the zoning hearing board regarding the need for the variance upon the following criteria:

"(1) That there are *unique physical circumstances* or conditions, including irregularity, narrowness or shallowness of lot size or shape, or *exceptional topographical* or other *physical conditions peculiar to that particular lot* and *that the unnecessary hardship is not financial* and is due to such unique physical conditions and not the circumstances or conditions generally created by the provisions of this chapter in the zoning district in which the lot is located. (emphasis added)

"(2) That because of such physical circumstances or conditions, there is *no possibility* that the lot can be developed in strict conformity with the provisions of this chapter and that the authorization of a variance is therefore necessary to enable the reasonable use of the lot. (emphasis added)

"(3) That such unnecessary hardship has not been created by the appellant.

"(4) That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare." (Resolution 07-80R, 9-10).

The ZHB denied the requested setback variances based on the finding that PPM failed to carry its burden of proof of showing an "unnecessary hardship." (ZHB Br. 9.)

## Unnecessary Hardship

As noted by Judge Warman in his April 30, 2009 opinion and order, the Supreme Court of Pennsylvania has ruled that different standards apply to different types of variances. *Hertzberg v. Zoning Board of Adjustment of the City of Pittsburgh,* 554 Pa. 249, 721 A.2d 43 (1998). The Supreme Court began its analysis saying:

"The issue here involves a *dimensional variance* and not a use variance—an important distinction ignored by the Commonwealth court. When seeking a dimensional variance within a permitted use, the owner is asking only for a reasonable adjustment of the zoning regulations in order to utilize the property in a manner consistent with the applicable regulations. Thus, the grant of a dimensional variance is of lesser moment than the grant of a use variance, since the latter involves a proposal to use the property in a manner that is wholly outside the zoning regulation . . . . The Commonwealth court rejected

this standard without discussing the difference between a dimensional and a use variance and applied the very strict standard which has been developed for use variances—that the property owner must demonstrate unnecessary hardship by showing that the property is valueless without the variance and cannot be used for any other permitted purpose . . . . *We find that the instant matter is an appropriate case to make a formal declaration that the quantum of proof required to establish unnecessary hardship is indeed lesser when a dimensional variance, as opposed to a use variance, is sought." Id.* at 47-48. (emphasis added)

The Supreme Court concluded by announcing the appropriate standard for dimensional variances in Pennsylvania as follows:

"We now hold that in determining whether unnecessary hardship has been established, courts should examine whether the variance sought is use or dimensional. *To justify the grant of a dimensional variance, courts may consider multiple factors, including the economic detriment to the applicant if the variance was denied, the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood. Id.* at 50. (emphasis added)

Despite Judge Warman's citation of the case as aforesaid, the standard set forth in *Hertzberg* is not the standard that the ZHB applied here. Failure to apply the correct standard is an error of law. The variances requested are obviously just "dimensional" variances because windmills are an appropriate special exception use in an "A-

1" Agricultural-Rural Zone. (Resolution 07-80R, 4.) Therefore, *economic detriment, financial hardship, and the characteristics of the surrounding neighborhood* should have been considered by the ZHB, and must be considered by this court in reviewing the decision of the ZHB.

Mr. Verkleeren gave testimony regarding the company's need to place the towers in the specific locations proposed. Mr. Verkleeren said:

"Mainly what we look for is ground surface elevation [that] is indicative of better performance. So, if we can locate a turbine on the same property, usually the highest elevation on that property in that east-west direction is what we seek. But, again, that location was mainly selected for wind resource assessment and location, separation of distances between dwellings along Skyline Drive. It was pushed as far west as possible on that parcel because of dwellings to the east." (Tr. 10/17/07, p. 70); (See also, Tr. 10/17/07, pp. 43-44).

Testimony as to the extent of PPM's claimed unnecessary hardship was presented with respect to proposed tower 23. The variance sought was only 18 feet. A member of the ZHB suggested the variance was unnecessary, and questioned Mr. Verkleeren saying, "18 feet, that way you're talking, 300 feet high. Is it really going to affect the wind and the property line that much?" (Tr. 10/17/07, p. 72.) Mr. Verkleeren responded, "[t]hat is a very narrow ridge line at that location, and moving it another 20 feet to the east would make the foundation and the installation of that very difficult and possibly quite likely very expensive." *(Id.)*

PPM introduced testimony showing that the variances were requested to optimize turbine locations based on four factors:

(1) achieving maximum distance from residences,

(2) wind assessment to ensure performance,

(3) placement in an east to west orientation due to the prevailing winds, and

(4) construction on the highest possible elevations. (Tr. 10/17/07, p. 70); (See also, tr. 10/17/07, pp. 43-44).

The ZHB's brief in opposition to this appeal concludes that PPM did not present any testimony showing an unnecessary hardship due to unique physical circumstances. (ZHB Br. 9.) The above substantial and uncontradicted testimony demonstrates that the opposite is true. Chestnut Ridge in its entirety presents "exceptional topographical or other physical conditions peculiar to the property," and relocating the towers would clearly cause "financial hardship" and "economic detriment." Just as coal cannot be mined in locations where it is not present; on the same logic, wind cannot be "harvested" in locations where it is not present.

Further, the proposed wind power development is consistent with "the characteristics of the surrounding neighborhood" as demonstrated by the adjoining landowners joining in the project as co-lessors. The eight specific towers for which dimensional variances are requested—together with the distance to the adjoining property and the name of the owner thereof—include: tower 11 (Brown)—115 feet from line of Brown; tower

474

19 (Coastal)—95 feet from line of Carbon Fuel; tower 21 (Brown)—100/120 feet from lines of Coastal; tower 22 (Brown)—55 feet from line of Coastal and 145 feet to line of Dunham; tower 23 (Dunham)—245 feet from line of Coastal; tower 24 (Brown)—90 feet from line of Coastal; tower 25 (Brown)—165 feet from line of Coastal; and tower 26 (Coastal)—195 feet from line of Brown. The setback for tower 11 was denied even though the *same* person owned the property on the other side of the line. All of the variances were denied *even though the landowners on both sides of the line joined in and consented to the wind turbine use!* There is no reference in the resolution or the ZHB brief to any public health, safety or welfare benefit that results from the ZHB's enforcing the literal terms of the setback with respect to an adjoining landowner that has joined in and consented to the development of the wind turbine project. That is simply because there is no public benefit. There are no fires to be stopped, no emergency vehicle access to be maintained, and no residential character to be maintained. There is only the collision between the sincerely held views of the objectors and the rights of the private landowners.

As noted in *Hertzberg,* "profit motivation"—the flip side of "economic detriment"—is a perfectly appropriate consideration in determining the absence or presence of "unnecessary hardship." Judge Warman's opinion clearly explained that "financial hardship" and "economic detriment" must be considered by the ZHB, and that the Fayette County Ordinance had to be disregarded to the extent it deviated from the authorizing statute, the Pennsylvania Municipalities Planning Code (which does not

exclude financial hardship as a consideration). The ZHB committed an abuse of discretion and an error of law by applying the wrong legal standard and disparaging "profit motivation" as the only reason supporting the variances, (ZHB br. 10) when profit—the converse of "economic detriment" and "financial hardship"—should have been considered as a factor in favor of the variances.

The uncontradicted testimony of record shows that the proposed placement of each of the towers was based on appropriate assessment of the economic factors, and an accurate assessment of the "characteristics of the surrounding properties." Therefore, PPM did satisfy its burden of proof under the Supreme Court decision in *Hertzberg, supra,* and the rulings of Judge Warman, and has demonstrated "unnecessary hardship."

Risk of Ice Throws

The ZHB also denied the eight variances because "PPM failed to meet its burden with respect to section 1910.2(a)(4) of the MPC and section 1000-1102 A 4 of the Fayette County Zoning Ordinance as it failed to demonstrate that the variance requested, if authorized, would not be detrimental to the public welfare." (ZHB br. 10.) Paragraph 11 of resolution 07-80R says, "[t]he board heard uncontroverted testimony from an objector regarding a Penn State study demonstrating ice throws from turbines of as great as 425 feet." (Resolution 07-80R, findings of fact ¶11.) PPM representatives testified that as a "result of the probability of ice throws, it would not locate a turbine within 500 feet of a roadway . . . Yet,

PPM requested that the board grant setback variances to allow turbines within 55 feet of a property line." (Resolution 07-80R, conclusions of law ¶9); (tr. 10/31/07 pp. 155-56); (tr. 10/17/07 p. 122).

The ZHB argues that it:

"correctly concluded that moving any of the eight turbines closer to a property line as requested by PPM as opposed to keeping the turbines a minimum of 100 percent of the wind turbines height (262.5 feet) from property lines as required . . . ,with dangerous ice throw potential of 425 feet, provided evidence to establish that the requested change in setbacks would result in increased harm from ice throws . . . ." (ZHB br. 11).

But the ZHB decision again focuses on the wrong parameters. All of the variances requested are from "property lines" shared with other participating/consenting wind farm participants. (Tr. 10/17/07 pp. 18-21, 41-44.) As noted above, there is no public benefit to setbacks measured from the line of a *consenting* landowner. The landowners at issue have granted their private property rights to PPM. The ZHB denial only protects "victims" that do not exist.

A wind turbine has specific risks, just like electric lines, gas lines, power plants, and every other industrial facility has its own specific risks. (An obvious current example is the Gulf oil spill resulting from deep water drilling.) Private landowners have the right to decide what specific risks they will accept on their own property. The government can interfere only when those risks will have off-site effects that will impact members of the

public who have not consented. There is no public detriment here because the adjoining private landowners have voluntarily accepted the risks the "wind farm" entails.

PPM carried its burden of proof by showing that a setback measured from the property line of a *participating landowner* does not advance or promote *public* health, safety, or welfare in any way. The risk of "ice throw" onto a participating property is not a detriment to the public. Since PPM has shown both "unnecessary hardship," and the absence of public detriment, the ZHB abused its discretion and made an error of law by denying the variances.

### 2) *Denial of Special Exceptions, for Towers Nos. 11, 19, 21, 22, 23, 24, 25, and 26*

Judge Warman recognized that: "[a] special exception is in fact not an exception to the zoning ordinance, rather it is a use expressly permitted by the ordinance provided specifically enumerated standards are met." Citing *Appeal of Dippolito,* 833 A.2d 336, 342 (Pa. Commw. 2003); *In re Appeal of Brickstone Realty Corporation,* 789 A.2d 333, 340 (Pa. Commw. 2001). A use that qualifies for a special exception is already presumed to satisfy local concerns for the general health, safety, morals and general welfare of the community. *In re: Appeal of Brickstone Realty Corp.,* 789 A.2d at 340. Once the applicant for a special exception shows compliance with the specific requirements of the zoning ordinance, a presumption arises that the proposed use is consistent with the health, safety, and general welfare of the community. *Id.* The burden then shifts to the objectors to the

application to prove that the proposed use will have a detrimental effect on the health, safety, and general welfare of the community. *Id.* The objectors cannot meet their burden by merely speculating as to possible harm, but instead must show a high degree of probability that it will substantially affect the health and safety of the community. *Manor Healthcare Corporation v. Lower Moreland Township Zoning Hearing Board,* 139 Pa. Commw. 206, 217, 590 A.2d 65, 71 (1991).

The ZHB denied the special exceptions for these eight towers because towers nos. 11, 19, 21, 22, 23, 24, 25, and 26 are not in literal compliance with the modified setback requirement of 262.5 feet that the ZHB refused to vary. Judge Warman's order of May 15, 2009 directed the ZHB to "grant the special exceptions in accordance with the law." He did not direct the ZHB to "grant *or deny* the special exceptions in accordance with the law." Judge Warman's ruling is the "law of the case," and the ZHB committed an error of law by failing to follow that ruling. There is no reasonable basis to deny special exceptions based on property lines when all of the adjoining landowners specifically consent to the wind farm use.

PPM's brief succinctly points out the legal flaw in the ZHB's position, saying: "[s]ince the denial of the variances was itself the product of error of law and abuse of discretion, the denial of the special exceptions is likewise error of law and abuse of discretion." (PPM Br. 18.)

The special exceptions for towers numbered 11, 19, 21, 22, 23, 24, 25, and 26 must each be granted in accordance with Judge Warman's decision and as set forth above.

### 3) *Conditions Placed on the Special Exceptions*

Pennsylvania statute provides the applicable standard for attaching conditions to the ZHB's grant of a "special exception" as follows:

"Where the governing body, in the zoning ordinance, has stated special exceptions to be granted or denied by the board pursuant to express standards and criteria, the board shall hear and decide requests for such special exceptions in accordance with such standards and criteria. In granting special exceptions, the board may attach such reasonable conditions and safeguards, in addition to those expressed in the ordinance, as it may deem necessary to implement *the purposes of this act and the zoning ordinance."* 53 Pa.C.S. §10912.1 (West 1997). (emphasis supplied)

The Commonwealth Court of Pennsylvania in the case of *HHI Trucking & Supply Inc. v. Borough Council of the Borough of Oakmont,* 990 A.2d 152 (Pa. Commw. 2010) provides the "analytical framework" for a court reviewing conditions as follows:

"(1) the objectors to the conditions have the initial burden of proof to show that the conditions are unreasonable;

"(2) the conditions must be "supported by the evidence of record". Where the

"municipality imposes a condition to prevent [a] 'harm' for which there is no evidence [of] record, that condition is not reasonable. Stated otherwise, the municipality abuses its discretion when it imposes a condition without supporting evidence in the record.

"and;

"(3) the conditions must relate 'to a standard adopted in the applicable zoning ordinance' in order to avoid 'inconsistent results:'

"This is necessary because a zoning hearing board's jurisdiction is limited to enforcement of the zoning ordinance. A zoning hearing board does not enjoy broad, inchoate powers to advance its members' visions of what constitutes the public welfare or even the public welfare as defined in a variety of environmental protection statutes, be they state or federal. Other governmental agencies bear that enforcement authority." *Id.* at 160.

On appeal, PPM has challenged the following five conditions:

"(1) PPM shall construct, prior to the operational status of each turbine, a twelve foot chain link fence surrounding the perimeter of the base of each wind turbine which chain link fence shall be locked at all times. This condition is being placed in an effort to mitigate a potential that the wind turbines will become 'attractive nuisances.'

"(2) Subsequent to the erection of each wind turbine, PPM shall re-vegetate the forest land that was disturbed for purposes of creating ingress and egress to the construction site and for the construction of the wind turbines. PPM shall plant fast growing conifers in order to re-vegetate the disturbed forest land. The planting of the fast growing conifers shall occur during the earliest planting season subsequent to the construction of each wind turbine. PPM shall maintain an access road to each turbine for purposes of maintenance and safety.

"(3) PPM shall take the following measures in order to protect the bat population (both local and migrating) in the area as follows:

"(a) PPM shall enter into a cooperation agreement with the Pennsylvania Game Commission and the U.S. Fish and Wildlife Service which agreement shall contain a set of studies to be performed by PPM both pre-construction and post-construction of the wind turbine project. A copy of said cooperation agreement shall be forwarded to the Fayette County Office of Zoning, Planning and Community Development within 10 days of the execution of said agreement by all parties. The operation of any wind turbine shall not be permitted until such time as the cooperation agreement has been received by the Fayette County Office of Zoning, Planning and Community Development.

"(b) PPM shall use the device developed by the Bat and Wind Energy Cooperative International as testified to with regard to the Casselman site by PPM representative Sam Enfield during the hearing of December 19, 2007.

"(c) PPM shall perform a curtailment test working in conjunction with Bat Conservation International as testified to with regard to the Casselman site by PPM representative Sam Enfield during the hearing of December 19, 2007.

"(d) PPM shall curtail operations of its wind turbines during periods of low wind speeds (defined by PPM as wind speeds below six meters per second) in the summer months when the greatest bat mortality occurs pursuant

to testimony of Sam Enfield, representative of PPM, at the December 19, 2007, Board hearing.

"(e) If PPM's post construction studies performed pursuant to the cooperation agreement between PPM and the Pennsylvania Game Commission and U.S. Fish and Wildlife Service indicate a serious bat kill problem as defined by PPM in its study (exhibit "A") as 2200 bat kills in one year, then PPM shall tether[2] its wind turbines during the hours of 7 p.m. through 7 a.m. beginning July 16 and ending September 15, beginning the first year the threshold number of 2200 bat kills occurs.

"(4) PPM shall conduct sound studies (decibel level studies) regarding decibel levels found at each and every property line once each wind turbine is operational. Said studies shall be performed within three months of each wind turbine becoming operational. PPM shall employ an independent sound expert who has no affiliation with PPM or any of its subsidiaries, but, rather, is an independent contractor hired to perform the sound studies. PPM shall provide the Fayette County Office of Zoning, Planning and Community Development with the name of the sound expert or sound company who will perform the sound study together with the sound expert or sound company's resume or curriculum vitae. Once the sound study is performed, PPM shall provide the Fayette

---

2. The exchange in the record between the ZHB and Laurel Caverns Conservancy on which this condition is based details "feathering," not "tethering." This court assumes that the ZHB intended to impose a condition on PPM to "feather" the blades (change their angle relative to the wind in order to slow or stop their rotation) and not to "tether" them, which would require attaching a rope or chain to prevent rotation. See (tr. 1/30/08, pp. 22-25, 82-84.)

County Office of Zoning, Planning and Community Development with a copy of the final sound study report within 10 days of PPM's receipt of the same.

"(5) Pursuant to section 1000-876(N) of the Fayette County Zoning Ordinance, all of the fourteen turbines numbered 1, 2, 3, 4a, 5, 6, 8, 9, 10, 15, 16, 17, 18, and 20 which are granted special exceptions shall be in compliance with increased setback requirements to 500 feet from all roadways and 425 feet from all property lines to avoid the potential of dangerous ice throw."

PPM argues that conditions 1 through 5 are "manifestly unreasonable, unsupported by the record, improperly based on broad policy statements, are so onerous as to bar the permitted use and are otherwise contrary to law and/or outside the board's jurisdiction or authority." This court will therefore examine each condition individually to determine if it violates the tests found in *HHI Trucking & Supply Inc.*

## Construction of a 12 Foot Chain Link Fence Around Each Turbine

The ZHB heard testimony at the hearing of October 31, 2007 regarding the impact turbines may have on tourism. A representative from PPM stated—based on the company's experience—that people generally want to come and see a "wind farm." (Tr. 10/31/07, pp. 100-05.) Based on this testimony, the ZHB imposed the fencing condition to prevent the turbines from becoming "attractive nuisances." (Resolution 07-80R, 18.)

There is no evidence in the record to support a finding that the turbines would become "attractive nuisances"

with or without fencing. The testimony relied on by the ZHB details the *positive* impacts turbines have on tourism, not potentially negative ones. (See tr. 10/31/07, pp. 100-05.) (*E.g.,* Windmills are well-recognized as tourism assets in Holland.) PPM's representative testified that at other sites the company has entered into agreements with landowners to allow for the creation of pull-off areas with displays detailing information about the site. (*Id.* at 104-05.) The only testimony that refers to a possible negative impact is: "[s]o, we'll actually design into the project some way to accommodate that [a pull-off], and they don't have to go traipsing across people's land. We don't want them to do that." (*Id.*)

The fencing condition will not prevent trespassing. A fence will not prevent tourists from leaving their cars and walking on private property to view the towers. A fence will only prevent people from walking the last few feet right up to the base of the turbines. There was no evidence that fencing would protect anyone from anything. On the contrary, a chain link fence would actually create more of an "attractive nuisance" than the towers— since it is relatively easy to climb on or cut through a chain link fence, and it would be exponentially more difficult to climb on or cut into the turbine tower itself.

Condition 1 is clearly intended "to prevent a 'harm' for which there is no evidence in the record." Therefore, PPM has carried its burden of proof. The fencing condition is unreasonable and must be stricken.

Re-vegetation of the Disturbed Forest Area

Condition two requires PPM to re-vegetate the forest land that is disturbed for purposes of creating ingress and

egress to the construction site and for the construction of the wind turbines. (ZHB br. 20.) PPM acknowledges that there would be clearing of forest around the turbines of up to a 200 foot radius. (Tr. 10/31/07, pp. 132-33.)

The ZHB cites its authority and reasoning for this condition as

"in keeping with the general policies of the Fayette County Zoning Ordinance regarding reclamation of disturbed land and protection and preservation of forest lands found at Article XII of the Fayette County Zoning Ordinance as well as Sections 603(g)(2) and 604 of the MPC. Additionally, revegetation serves the purpose of minimizing erosion and sedimentation problems and the potential for flooding if the land is left without vegetation." (*Id.*)

PPM met its burden of proof showing that this condition is unreasonable for two independent reasons: first, the re-vegetation of private property outside of a residential development is not normally a matter for public concern. A private landowner in an A-1 zone typically has the right to remove any vegetation and replace it with anything or with nothing at all. If the landowner wants corn or grass or even oak trees instead of "fast growing conifers," the ZHB is without authority to interfere. As noted previously, the ZHB decision fails to recognize the important fact that the proposed "wind farm" is the product of contractual agreements with the private owners of the property. Those owners were free to negotiate a re-vegetation agreement with PPM if they chose to do so. In the absence of such a contractual provision, an owner of A-1 zoned forest lands has the right to allow the removal of every tree and every shrub.

Second, the ordinance already requires that the applicant follow the Pennsylvania Handbook of Best Management Practices, and the Department of Environmental Protection (DEP) has specific statutory authority and comprehensive regulations detailing the circumstances when the removal of vegetation from privately-owned forest land is a matter of public concern, and what a landowner must then do to prevent negative impacts *off* the property (typically prepare and follow a compliant "erosion and sedimentation control plan" when an area exceeding five acres is disturbed). As important as the protection of forest land is, such protection is already well provided for, and is not the responsibility of the ZHB. If PPM clears enough land to trigger concerns with the DEP, then the DEP will require the appropriate erosion and sedimentation control plan, and the DEP may require revegetation as a part of that plan. To the extent the ZHB conditions agree with the DEP regulations, the conditions are irrelevant. To the extent the ZHB conditions are inconsistent with the DEP regulations, they are unreasonable.

General environmental policy considerations and another agency's regulations do not justify the ZHB in imposing this condition. The re-vegetation condition is unreasonable and must be stricken.

### Bat Protection

The ZHB imposed a detailed five-part condition to protect the bat population that was based on testimony of several witnesses, including PPM's own representatives. See (tr. 10/31/07, pp. 58-69, 169-175); (tr. 12/19/07,

pp. 36-41, 142-146); (tr. 1/30/08, pp. 6-11). Wind turbines can kill significant numbers of bats. PPM's own representative described the danger posed to bats based on his knowledge of bat kills at other sites. (Tr. 12/19/07, p. 123.) He also said, "in this region, unlike the rest of the country, we've seen fairly significant impacts on bats. We don't believe it's the local bats. We believe it's the migrants moving through during migration." (Tr. 10/31/07, p. 61.)

As noted above, the U.S. Department of Energy has a goal of producing 20 percent of the country's total energy from wind energy by the year of 2030. *20 percent Wind Energy by 2030: Increasing Wind Energy's Contribution to U.S. Electricity Supply* (2008). The cited publication says, "[s]tates, collaboratives, and the National Academy of Sciences (NAS) have identified gaps in the knowledge base about wind energy and its risks." *Id.* at 121. One of these gaps in the knowledge base surrounds the impact that wind turbines have on bats. *Id.* at 122.

As noted above, the law prohibits the ZHB from advancing "its members' visions of . . . the public welfare as defined in a variety of environmental protection statutes, be they state or federal." *HHI Trucking & Supply Inc., supra,* 990 A.2d. at 160. A member of the ZHB himself said, "the board isn't really empowered to protect the species of bats." (Tr. 12/19/07, pp. 115-16.)

However, the ZHB did hear expert testimony from PPM's own representative regarding the extent of a potential bat kill. Bats have an obvious role in the ecosystem, and the health of bat populations may have an effect

on the future "health, safety and welfare" of the public. Therefore, the ZHB correctly concluded that a significant bat kill would be detrimental to the public welfare. (See tr. 12/19/07, pp. 115-16.) Thus, there is "substantial competent evidence" supporting portions of the third condition.

The court must next consider whether the bat protection condition "relates" to a "standard adopted in the applicable zoning ordinance;" and whether any aspect of bat protection is regulated by another governmental agency comprehensively, and to what extent that preempts the authority of the ZHB.

The first listed "bat protection" condition requires a cooperative agreement between PPM and the United States Fish and Wildlife Service (USFWS) and the Pennsylvania Game Commission (PGC).

The USFWS only protects bat species that are endangered. There was no evidence of any endangered bats at this site. If the wind turbines ever do cause the death of endangered bats, USFWS would have the legal authority and obligation to shut the turbines down until and unless PPM obtains an "incidental take permit," a process that can take several years and cost millions of dollars. A federal judge recently stopped a 40 turbine project known as Beech Ridge in West Virginia because of its potential to kill the endangered "Indiana bat." *Animal Welfare Institute v. Beech Ridge Energy,* 675 F. Supp. 2d 540 (D.Md. 2009). With respect to endangered species of bats, the federal government has enacted a comprehensive regulatory scheme that clearly demonstrates federal pre-emption. Thus, the ZHB cannot require PPM

to make an agreement with the U.S. Fish and Wildlife Service.

The Pennsylvania Game Commission (PGC) has general statutory power to protect all bats, including non-endangered species of bats. Title 34 of the Game and Wildlife Code at §2102 provides:

"The commission shall promulgate such regulations as it deems necessary and appropriate concerning game or wildlife and hunting or furtaking in this Commonwealth, including regulations relating to the protection, preservation and management of game or wildlife and game or wildlife habitat." 34 Pa.C.S. §2102 (1998).

Although the PGC has the power to protect bats, the PGC has not comprehensively regulated that field, and the PGC has exercised little direct control over decisions about the location of wind turbines. Thus, Fayette County retains the authority to make decisions about the appropriate site for wind towers, and the ZHB can impose appropriate conditions reflecting areas of local concern for that particular site, but the ZHB conditions cannot infringe on the areas where the PGC exercises comprehensive authority and has pre-empted local regulation. *Duff v. Northampton Township,* 110 Pa. Commw. 277, 532 A.2d 500 (1987), *affirmed,* 520 Pa. 79, 550 A.2d 1319 (1988) (where the Commonwealth court held that PGC regulation of hunting was comprehensive and exclusive and did preempt local regulation of hunting). To the extent that the PGC wants to be involved in protecting bats from wind turbines, that agency can exercise the full authority granted to it by the legislature. However, there is no good reason for the ZHB to require PPM to make an agreement with the PGC, and such a condition

impermissibly infringes on the exclusive authority of the PGC. The first portion of the condition, therefore, must be stricken.

The second, third and fourth "bat protection" conditions provide:

"PPM shall use the device developed by the Bat and Wind Energy Cooperative International as testified to with regard to the Casselman site by PPM representative Sam Enfield during the hearing of December 19, 2007.

"PPM shall perform a curtailment test working in conjunction with Bat Conservation International as testified to with regard to the Casselman site by PPM representative Sam Enfield during the hearing of December 19, 2007.

"PPM shall curtail operations of its wind turbines during periods of low wind speeds (defined by PPM as wind speeds below six meters per second) in the summer months when the greatest bat mortality occurs pursuant to testimony of Sam Enfield, representative of PPM, at the December 19, 2007, board hearing."

PPM has not demonstrated that these conditions are inconsistent with any existing regulations of the PGC. All three conditions are subject to future modification in the event better methods of mitigation are developed, or if the conditions become inconsistent with a more comprehensive state or federal regulatory scheme. However, PPM has not demonstrated that these three conditions are inconsistent with any current law or regulation, and PPM's appeal of them must be denied.

The final "bat protection" condition refers to the agreement required by the first condition invalidated above,

and must be modified to eliminate that aspect. Moreover, it incorporates a typographical error (referenced in footnote 3, below). Thus, the final "bat protection" condition must be modified to read as follows:

"PPM shall monitor the number of bats killed by its wind turbines, and if a total of 2,200 or more bats are killed in any period of 12 consecutive months, then PPM shall feather[3] its wind turbines during the hours of 7 p.m. through 7 a.m. from July 16 to September 15, beginning as soon as the threshold number of 2,200 bat kills occurs, and each year thereafter, unless this condition is modified for good cause shown."

As so modified, the condition reflects the appropriate role of the ZHB in this situation, which is to adjust and condition lawful uses for specific local factors, in this instance, the local prevalence and movement patterns of bat populations. For all of these reasons, the appeal of PPM relative to this condition must be denied in part and granted in part as set forth above.

## Sound Studies

The fourth condition "requires PPM to conduct sound studies regarding decibel levels found at each and every property line once each wind turbine is actually opera-

3. The exchange in the record between the ZHB and Laurel Caverns Conservancy on which this condition is based details "feathering," not "tethering." Therefore, this court must assume that the ZHB intended to impose a condition on PPM to "feather" the blades (change their angle relative to the wind in order to slow or stop their rotation) and not to "tether" them, which would require attaching a rope or chain to prevent rotation. See (tr. 1/30/08, pp. 22-25, 82-84.)

tional." (ZHB br. 23.) The ZHB says this condition is necessary "because the project is not operational and is incapable of being studied." (*Id.*) Furthermore, the ZHB heard the concerns of residents living near the project site who are worried about the sound produced by the turbines. See (tr. 1/30/08, pp. 47-50, 66, 101). The impact of the noise on neighboring landowners is an appropriate zoning concern under §912.1 of the MPC.

However, PPM met its initial burden of proof showing that condition four is not reasonable because the condition is simply not necessary. The Fayette County Zoning Ordinance already states that "[n]oise from any windmill/ wind turbine shall not exceed 70 decibels when measured from property line."

In addition, the condition is unreasonable because it is unsupported by the record. The uncontradicted testimony of PPM's representative was that it is impossible for these turbines to reach the 70 decibel threshold even immediately at the towers' bases. (Tr. 10/31/07, p. 75.) There is no evidence of any "harm" at this point, so a condition dealing with such a non-existent harm is an abuse of discretion. If the towers ever do reach 70 decibels at a non-participant's property line, then the ordinance as written should allow them to protect themselves. (See tr. 10/31/07, p. 25.)

For all of these reasons, the noise condition must be stricken.

### Increased Setbacks

Condition five increases setbacks for all wind turbines to 500 feet from roadways and 425 feet from *all* prop-

erty lines to eliminate the risk associated with "ice throw." (Resolution 07-80R, 20.) PPM has not met its burden of proof to show that this condition is entirely unreasonable because the evidence in the record does support some "ice throw" condition. PPM's own representative testified about the risk of ice throws. (Tr. 12/19/07, p. 26); (tr. 10/31/07 pp. 155-56); (tr. 10/17/07 p. 122).

However, the ZHB cannot reasonably be concerned about ice throws *within* the exterior boundaries of the land comprising and participating in the wind farm. Again, the landowners of the properties within the wind farm have voluntarily accepted the risks associated with wind turbines, and to the extent they have knowingly, intelligently and voluntarily bargained away their private property rights, they are not members of the "general public" that the ZHB has the duty and authority to protect.

The surviving portions of this condition that are supported by substantial evidence are:

"(a) a setback requirement of 500 feet from the center of the turbine base to the nearest edge of the right-of-way of any public road,

"(b) a setback requirement of 425 feet from the center of the turbine base to the line of any property not covered by a recorded lease or other appropriate conveyance to PPM that specifically references the risk of ice throws, and

"(c) a requirement of reasonable notice to other persons who might foreseeably be within such increased setbacks.

Such notice could be provided by posting conspicuous signage at 100' intervals around the perimeter of the property at risk throughout the relevant winter season."

## CONCLUSION

The court is aware that there have been revisions to the zoning ordinance since submission of this appeal to the court that could ultimately render this decision moot. The court is also aware that there are revisions to the ordinance now pending that will probably render this decision moot. Those past and future revisions dramatically illustrate the point made above that there are still many unanswered questions about the best way to implement wind energy technology. The laws governing wind energy are in an understandable state of flux. However, neither party has requested that the appeal be withdrawn.

Further, PPM is entitled to proceed with every permit application lawfully and timely made, whether it was requested under the old ordinance, the current ordinance, or some future ordinance. PPM has the right to proceed under whichever version of the ordinance that appears most favorable to them.

Because the zoning hearing board made errors of law and abused its discretion by denying the setbacks, denying the special exceptions, and imposing certain specific inappropriate conditions, this court must grant the appeal of PPM in large part.

PPM's applications have been entrusted to the ZHB twice, and they have been awaiting a final decision for

nearly three years, since September of 2007. As a result, it is unfair and would be a deprivation of due process to remand the case to the ZHB again. Therefore, the court will itself modify resolution 07-80R as set forth in the following order:

## ORDER

And now, June 17, 2010, for the reasons set forth in the preceding opinion, Fayette County Zoning Hearing Board Resolution 07-80R is hereby modified as follows:

"(1) The denial of the setback variances for towers nos. 11, 19, 21, 22, 23, 24, 25, and 26 is reversed, and said setback variances are hereby granted for the locations specified.

"(2) The denial of the special exceptions for towers nos. 11, 19, 21, 22, 23, 24, 25, and 26 is reversed, and said special exceptions are hereby granted for the locations specified.

"(3) The first condition requiring the construction of a 12 foot chain link fence around each turbine is unreasonable and is hereby stricken.

"(4) The second condition requiring re-vegetation of the disturbed forest area is unreasonable and is hereby stricken.

"(5) PPM has carried its burden in part, and failed to carry its burden in part with respect to the third condition requiring an elaborate protocol on bat conservation. Therefore, this condition is sustained in part, and denied

in part, and is hereby modified to the extent that the condition applies to all 22 towers granted a special exception and shall hereafter read:

"(a) PPM shall use the device developed by the Bat and Wind Energy Cooperative International as testified to with regard to the Casselman site by PPM representative Sam Enfield during the hearing of December 19, 2007, unless this condition is modified for good cause shown.

"(b) PPM shall perform a curtailment test working in conjunction with Bat Conservation International as testified to with regard to the Casselman site by PPM representative Sam Enfield during the hearing of December 19, 2007, unless this condition is modified for good cause shown.

"(c) PPM shall curtail operations of its wind turbines during periods of low wind speeds (defined by PPM as wind speeds below six meters per second) in the summer months when the greatest bat mortality occurs pursuant to testimony of Sam Enfield, representative of PPM, at the December 19, 2007, Board hearing, unless this condition is modified for good cause shown.

"(d) PPM shall monitor the number of bats killed by the wind turbines, and if there are 2,200 or more bats killed in any period of twelve consecutive months, then PPM shall feather its wind turbines during the hours of 7 p.m. through 7 a.m. from July 16 to September 15, beginning as soon as the threshold number of 2,200 bat kills occurs, and each year thereafter, unless this condition is modified for good cause shown.

"(6) The fourth condition requiring sound studies is unnecessary and unreasonable and is therefore stricken.

"(7) PPM has failed to carry its burden of proof showing how the fifth condition increasing setbacks for all turbines granted special exceptions is entirely unreasonable, but has carried its burden of showing the condition is unreasonable to the extent the setback applies to land covered by a lease or other appropriate conveyance to PPM. Therefore, this condition is sustained in part, and denied in part, and is hereby modified to the extent that the condition applies to all 22 towers granted a special exception and includes:

"(a) a setback requirement of 500 feet from the center of the turbine base to the nearest edge of the right-of-way of any public road,

"(b) a setback requirement of 425 feet from the center of the turbine base to the line of any property not covered by a recorded lease or other appropriate conveyance to PPM that specifically references the risk of ice throws, and

"(c) a requirement of reasonable notice to other persons who might foreseeably be within such increased setbacks. Such notice could be provided by posting conspicuous signage at 100' intervals around the perimeter of the property at risk throughout the relevant winter season."

In all respects not modified herein, Fayette County Zoning Hearing Board Resolution 07-80R shall remain in full force and effect.